## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 18 2018, 7:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Victoria L. Bailey
Danielle L. Gregory
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Andrea E. Rahman
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR GUARDIAN AD LITEM

DeDe K. Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.L., Mother, and E.L., Minor Child:<br><br>A.L.,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services, | October 18, 2018<br><br>Court of Appeals Case No. 18A-JT-1039<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Gary Chavers, Judge Pro Tempore<br>The Honorable Scott Stowers, Magistrate<br><br>Trial Court Cause No. 49D09-1708-JT-733 |

*Appellee-Petitioner,*

and

Child Advocates, Inc.,
*Appellee-Guardian Ad Litem.*

**Kirsch, Judge.**

[1] A.L. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor child, E.L. ("Child"). Mother raises the following restated issue for our review: whether the juvenile court's order terminating her parental rights was clearly erroneous because she contends it was not supported by sufficient evidence.

[2] We affirm.

## Facts and Procedural History

[3] Child was born on May 30, 2016. *Tr. Vol. II* at 7. In July 2016, the Indiana Department of Child Services ("DCS") removed Child from Mother's care because Mother admitted using marijuana and tested positive for the drug and had an unstable living situation. *Pet'r's Ex.* 1 at 5-6; *Tr. Vol. II* at 77-78, 104, 117-18. At the time of removal, Mother did not have age-appropriate bedding for Child and was not utilizing safe sleeping practices with Child. *Pet'r's Ex.* 1 at 6. Child was also periodically living with his maternal great aunt, who was

not his legal caregiver. *Id.* At that time, Mother was seventeen years old and was living with her father on the south side of Indianapolis, Indiana. *Tr. Vol. II* at 7, 10. Shortly thereafter, Mother moved in with her aunt and lived with her for about two years, during the course of the CHINS proceeding. *Id.* at 9. When Child was removed, he was placed in kinship placement with a woman named Nakia Jones. *Id.* at 103.

[4] On July 19, 2016, DCS filed a petition alleging that Child was a Child in Need of Services ("CHINS"). *Pet'r's Ex.* 1 at 5-7. The juvenile court conducted an initial hearing the same day and found that there was sufficient evidence to support the removal of Child. *Pet'r's Ex.* 3. At that time, the permanency plan for Child was reunification with parents. A fact-finding hearing on the CHINS petition was held on November 21, 2016, and the juvenile court adjudicated Child to be a CHINS and issued a dispositional decree ordering Mother to participate in the following services: home-based therapy, home-based case management, parenting assessment, substance abuse assessment, and random drug screens. *Pet'r's Ex.* 8 at 30-34.

[5] Lindsay Smith was assigned as the family case manager ("FCM Smith") for Mother and Child, and FCM Smith ordered referrals for Mother's supervised visitation, home-based therapy with parenting education, random drug screens, and a substance abuse assessment. *Tr. Vol. II* at 96. Sher'ron Anderson was assigned as the guardian ad litem ("GAL") for Child in October 2016. *Id.* at 68, 76.

[6]     In March 2017, Tracy Cork ("Cork") was assigned to work with Mother as a home-based case manager. Cork worked with Mother on employment, housing, and sobriety issues. *Id.* at 26. When Cork began working with Mother, Mother was not employed and did not have stable housing, but told Cork that she was sober and not using any substances. *Id.* at 26-27. During the time that Cork worked with Mother, Mother never created a resume or applied for jobs. *Id.* at 32. She told Cork that she was able to get a job at Lucas Oil Stadium, but never provided Cork with proof of that employment. *Id.* at 28. Cork also worked with Mother to try to obtain her GED, but Mother did not accomplish that goal while working with Cork. *Id.* at 31. During the time that Cork worked with Mother, the goal was to meet once a week, but Mother was not consistent in meeting with Cork, and over the course of six months, she only met with Cork six times. *Id.* at 27. Cork closed out her services with Mother unsuccessfully in September 2017 due to Mother's inconsistency and lack of follow through. *Id.* at 28.

[7]     On April 24, 2017, Mother turned eighteen, and a few days later, on April 28, she gave birth to L.L., Child's sister. At the time of the birth, both L.L. and Mother tested positive for THC. *Id.* at 94; *GAL Ex.* 1 at 62, *GAL Ex.* 3 at 66. On May 2, 2017, DCS filed a CHINS petition as to L.L., which was still pending at the time Mother's parental rights were terminated in the present case.

[8]     In May 2017, during a team meeting with her service providers, Mother was on her cell phone the "whole time; not engaging in the meeting at all." *Tr. Vol. II*

at 12-13. At this same meeting, Mother was not engaged, "sat on her phone the whole time, rolled her eyes, slouched, [and] got up and walked away several times." *Id*. at 73.

[9] In May 2017, Velora Anderson ("Anderson") was assigned to work with Mother as a home-based therapist. Anderson met with Mother once, but, thereafter, Mother never met with Anderson again. Anderson attempted to meet with Mother for home-base therapy approximately four or five more times, but Mother failed to show up for any of the meetings. *Id*. at 11. During one of Anderson's attempts to meet with Mother, she arrived at Mother's aunt's house for a scheduled meeting and knocked on the door. *Id*. at 11-12, 18. Mother did not answer the door and, instead, texted Anderson as Anderson was pulling out of the driveway to leave and told Anderson that she was too early. *Id*. At the end of June 2017, Anderson closed her referral to Mother as unsuccessful. *Id*. at 12.

[10] On August 14, 2017, a permanency hearing was held, and at the hearing, the GAL recommended that the permanency plan be changed to adoption. *Id*. at 68. She made that recommendation because Mother was not being compliant with services, was not engaged in any services at the time of the hearing, was not engaged in parenting time with Child, and "her whereabouts were unknown for a large portion of time." *Id*. The juvenile court ordered that the Child's permanency plan be changed to adoption because no service provider was recommending that the Child be returned to Mother, and Mother had not been complying with services. *Pet'r's Ex*. 11 at 45. However, the juvenile court

also ordered that services remain open in order to give Mother the opportunity to get Child back. *Tr. Vol. II* at 35.

[11] In the fall of 2017, Carolyn Lee-Carter ("Lee-Carter") was assigned to work with Mother as a home-based therapist after Anderson closed her referral with Mother. Lee-Carter attempted to contact Mother through email, but was unable to set up any meetings with Mother because Mother stopped responding to the emails. *Id.* at 20-21. Because Mother failed to respond, Lee-Carter closed out her referral as unsuccessful. *Id.* at 21.

[12] On September 26, 2017, Mother was charged with auto theft, a Level 6 felony, and the charges were still pending at the time of the termination hearing. A warrant was issued for Mother's arrest, and she was arrested at one of the CHINS hearings. *Id.* at 112-13.

[13] In December 2017, Erika Lawrence ("Lawrence") was assigned as Mother's home-based case worker and was responsible for supervising Mother's visits with Child. While she was assigned to Mother's case, Lawrence called Mother at least seven times and went to Mother's residence twice. *Id.* at 45-46. Because Lawrence was unable to ever meet with Mother, she closed out the referral as unsuccessful in January 2018. *Id.* at 46.

[14] Katie Ayres ("Ayres") was assigned to Mother's case as a home-based therapist in January 2018. *Id.* at 91. Ayres's first scheduled session with Mother was on January 31, 2018, but Mother did not show up. *Id.* The meeting was rescheduled to February 5, 2018, and Mother showed up to that meeting. *Id.*

Mother did not show up for the next scheduled session on February 9, 2018, so the meeting was rescheduled to February 16, 2018, but Mother did not show up to that appointment either. *Id*. at 92-93. Mother only showed up to one of the four sessions that Ayres scheduled with her. *Id*. at 93. After Mother missed the session on the February 16, Ayres closed out services as unsuccessful due to noncompliance. *Id*. at 93-94.

[15] Brooke McIntosh ("McIntosh") was assigned to work with Mother as a home-based case manager and to provide supervised visitation. *Id*. at 55. The goals McIntosh established with Mother to work toward were finding a job, obtaining housing, completing her GED, and connecting her with community resources and parenting skills. *Id*. at 56-57. McIntosh had her first meeting with Mother on February 3, 2018, and the week after that meeting, McIntosh went with Mother to look at some apartments as possible housing options. *Id*. at 56. McIntosh supervised six visitations between Mother and Child, and Mother engaged well with Child during the visits. *Id*. at 58. However, Mother failed to show up for two appointments with McIntosh on March 1 and 5, 2018, and was unable to attend three visits with Child on February 20 and 22, 2018 and March 1, 2018. *Id*. at 56, 58-59. Mother attended six visitations with Child, but was late to five of those visitations. *Id*. at 59. Although she was engaged with Child during most visits, during one visit that occurred at the library, Mother delayed starting the visit, so she could spend more time working on something personal on the library computer. *Id*. at 64.

[16] On August 21, 2017, DCS filed a petition for the termination of the parent-child relationship as to Mother and Father.[1] A termination hearing was held on March 8, 2018. About two months before the termination hearing, Mother moved in with her cousin, where she was still residing at the time of the termination hearing. *Id*. at 8-9. At the hearing, Mother testified about her previous employment at Lucas Oil Stadium and that she had worked there for two months in the winter of 2017, but she had received "three strikes" for either being late to work or failing to show up, so she no longer worked there. *Id*. at 129. At the time of the hearing, Mother was not attending school, GED classes, or work. *Id*. at 131. She testified that, during the day, she spent her time on her phone and taking care of herself and her health problems. *Id*. Mother further stated that her health problems did not, however, prevent her from working or going to school. *Id*. Mother testified that she did not think there was anything wrong with smoking marijuana while pregnant and that she did not see any benefit to the services provided by DCS. *Id*. at 134-35, 138.

[17] The GAL testified at the hearing that she believed that termination and adoption was in the best interests of Child. *Id*. at 69, 76. She stated that she did not believe Mother was able to properly care for Child because "she really doesn't have a bond with [Child]," and "she is not stable, she is from home to

---

[1] Father's parental rights were terminated by default on January 11, 2018, and he does not participate in this appeal.

home and there is no way that she can appropriate[ly] care for him and meet all of his needs." *Id*. at 70.

[18] FCM Smith testified that Mother never completed a substance abuse assessment or any of her services. *Id*. at 100. FCM Smith stated that Mother would regularly miss in-home drug screens, which caused the referral to be suspended, so FCM Smith had to continuously make new referrals for Mother to do the in-home drug screens. *Id*. at 109-10. FCM Smith testified that Mother had not "shown a willingness or ability to participate in services for an extended period of time" and that, given more time, FCM Smith did not "believe that [Mother] would be able to participate successfully in those services." *Id*. at 104. FCM Smith also stated that Mother was resentful towards the involvement of DCS and the various providers. *Id*. at 122. FCM Smith testified that she believed that termination was in the Child's best interests because Mother has not progressed in her services. *Id*. at 104-05.

[19] At the time of the hearing, Child was still in kinship placement with Nakia Jones ("Jones"), and Jones had stated that she wished to adopt Child. *Id*. at 70, 79, 103. The GAL and FCM Smith testified that Jones would provide Child with a stable home and would meet his long-term needs. *Id*. at 69-70, 103-04. At the conclusion of the hearing, the juvenile court took the matter under advisement, and on March 28, 2018, issued an order terminating Mother's parental rights to Child. Mother now appeals.

# Discussion and Decision

[20] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re T.F.*, 743 N.E.2d at 773. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[21] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145,

149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[22] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied.* First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[23] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the juvenile court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[24] Mother argues that the juvenile court erred in terminating her parental rights to Child because insufficient evidence was presented to support the determination. Specifically, Mother contends that DCS failed to present sufficient evidence that there was a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside of the home would not be remedied because she asserts that, despite her young age, she was able to obtain housing for the two months prior to the hearing and was actively looking for employment at the time of the hearing. She further asserts that, although a referral for therapy was made by DCS, there was no showing that she was in need of therapy and that, at the time of the hearing, she was still engaged in

services through her second child's case, and the completion of those services would remedy the removal in Child's case. Mother also claims that DCS failed to prove that the parent-child relationship posed a threat to the well-being of Child because she was bonded to Child and enjoyed parenting time with him, was participating in services through the CHINS matter for her second child, and wanted to reunify with Child. Additionally, Mother alleges that the juvenile court failed to consider her young age, which should have afforded her more time to demonstrate that she could parent Child. Mother also maintains that DCS failed to prove that termination was in the best interests of Child because she has shown that she has the willingness to provide permanency and a stable environment for Child and that, despite her young age, she was working toward having the ability to do so by looking for employment.

### Remediation of Conditions

[25] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether

there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.*, 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *A.F.*, 762 N.E.2d at 1252.

[26] In the present case, Child was removed from Mother's care because Mother admitted using marijuana and tested positive for the drug and had an unstable living situation. *Pet'r's Ex.* 1 at 5-6; *Tr. Vol. II* at 77-78, 104, 117-18. Although Mother argues that at the time of the hearing she was still engaged in services through her second child's CHINS case, and the completion of those services would remedy the removal in Child's case, the evidence presented showed that Mother had a year and a half to demonstrate that she was attempting to maintain a substance-free lifestyle and to make an effort to provide Child with a

stable living situation. The evidence showed that Mother had, in fact, not made any serious effort to remedy the conditions that resulted in Child's removal and continued placement outside of the home.

[27] Mother had not shown the willingness to stop consuming marijuana. Although she told people that she was sober, when she gave birth to her second child on April 28, 2017, both Mother and L.L. tested positive for THC. *Tr. Vol. II* at 27, 38, 94, 100; *GAL Ex*. 1 at 62, *GAL Ex*. 3 at 66. Mother also testified that she does not see anything wrong with consuming marijuana, even while pregnant. *Tr. Vol. II* at 134-35. Mother also did not demonstrate that she was able to provide a stable home for Child. At the time of the hearing, Mother did not have her own home and was relying on her extended family to provide a place for her and her children to live. When Child was removed, Mother had been living with her father, and shortly thereafter, she moved in with her aunt, where she lived for about two years. However, while she was living with her aunt in early 2017, Mother also spent some time living with her father and also with her sister. *Id*. at 26. The GAL testified that Mother's "whereabouts were unknown for a large portion of time" during the CHINS proceedings. *Id*. at 68. At the time of the hearing, Mother had moved out of her aunt's house because there was not enough room in the home for both her aunt's children and her own and was then living with her cousin. *Id*. at 8-9.

[28] Additionally, the evidence showed that Mother never completed a substance abuse assessment or any of the services referred to her by DCS. *Id*. at 100. Referrals with numerous service providers, including several home-based

therapists and home-based case managers, were all closed as unsuccessful.  *Id.* at 12, 21, 28, 46, 93-94.  FCM Smith stated that Mother regularly missed in-home drug screens, and Mother did not show "a willingness or ability to participate in services for an extended period of time" and would not successfully participate in services even if given more time.  *Id.* at 104.  Mother was also resentful towards the involvement of DCS and the various providers and during one team meeting, Mother spent the whole time on her cell phone, was not engaged in the meeting, and rolled her eyes and got up and walked away repeatedly.  *Id.* at 12-13, 73, 122.  Further, although Mother engaged well with Child during the six supervised visitations she attended, she failed to show up for two other scheduled visitations and was late to five of the six she did attend.  *Id.* at 58-59.  At the time of the hearing, Mother was not attending school, GED classes, or work and spent her days on her phone and taking care of herself and her health problems.  *Id.* at 131.

[29]    Throughout the case, Mother did not make any serious effort to remedy the reasons for Child's removal.  She did not attempt to finish her high school education or maintain a stable job or a stable residence.  She consistently disregarded and disrespected the efforts of DCS service providers.  Based on the evidence presented, we conclude that sufficient evidence was presented to support the juvenile court's conclusion that there is a reasonable probability that the conditions that resulted in removal or the reasons for placement outside the home would not be remedied.  Mother's arguments to the contrary are merely a

request to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.[2]

### *Best Interests*

[30]    In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interests of the child. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

---

[2] We need not address Mother's challenge to the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[31]     Mother asserts that DCS failed to present sufficient evidence that termination was in the best interests of Child because she had demonstrated that she was willing and working on being able to provide the permanency and stable environment that Child needed.  The evidence presented at the hearing showed that Child had been removed from Mother since July of 2016, and there had been no real progression in the services referred to Mother by DCS.  Mother was not going to school, attempting to obtain her GED, or working at the time of the hearing.  Child's caregiver, Jones, wanted to adopt Child, and the GAL and FCM Smith testified that they believed that Jones would provide Child with a stable home and meet his long-term needs.  *Tr. Vol. II* at 69-70, 103-04. Additionally, both the GAL and FCM Smith testified that they believed that termination was in Child's best interests because Mother had not progressed in her services and was not able to properly care for Child.  *Id*. at 69, 70, 76, 104-05.

[32]     A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship.  *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child.  *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).  At the time of the termination hearing, Child had been removed from Mother's care for a year and a half, and Mother had failed to make the changes in her life necessary to provide Child with a safe and healthy environment.  Based upon the totality of

the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Mother's parental rights was in Child's best interests.

[33] Decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact sensitive. *In re E.M.*, 4 N.E.3d at 640. We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[34] Affirmed.

Vaidik, C.J., and Riley, J., concur.